# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| RYAN W. FILBERT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:14-cv-00209-JAR |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Ryan W. Filbert's ("Filbert") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381–85.

### I. Background

On October 5, 2010, Filbert filed an application for disability insurance under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income under Title XVI, §§ 1381-1385. (Tr. 108, 102) The Social Security Administration ("SSA") initially denied Filbert's claim on March 11, 2011. (Tr. 48-51) Filbert filed a timely request for a hearing before an administrative law judge ("ALJ") on May 4, 2011. (Tr. 56-58) Following a hearing on October 17, 2012 (Tr. 12), the ALJ issued a written decision on December 7, 2012, upholding the denial of benefits. (Tr. 11-24) Austin requested a review of the ALJ's decision by the Appeals Council. (Tr. 7-8) On December 12, 2013, the Appeals Council denied Austin's request

1

for review. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Filbert filed this appeal on February 6, 2014. (Doc. 1) The Commissioner filed an Answer. (Doc. 7) Filbert filed a Brief in Support of his Complaint. (Doc. 15) The Commissioner filed a Brief in Support of the Answer. (Doc. 20) Filbert subsequently filed a Reply Brief. (Doc. 21)

## II.     Decision of the ALJ

The ALJ determined that Filbert meets the insured status requirements of the Social Security Act through September 30, 2015, and had not engaged in substantial gainful activity since February 9, 2010, the alleged onset date of disability. (Tr. 14) The ALJ found Filbert had the following severe impairments: loss of three fingers on his non-dominant hand, post-traumatic stress disorder, and major depression, but that no impairment or combination of those impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15)

After considering the entire record, the ALJ determined Filbert had the residual functional capacity ("RFC") to perform light work including the lifting of 10 pounds frequently and 20 pounds occasionally, but using his left land only as a help. (Tr. 16) Further, the ALJ determined Filbert was limited on his left hand in handling and gross manipulation, fingering and fine manipulation due to the loss of three fingers. (Tr. 16-17) Additionally, Filbert should never climb ropes, ladders or scaffolds and may only occasionally crawl. (Tr. 16) It was determined that Filbert maintained the intellectual capacity to understand and carry out simple instructions, but should take appropriate precautions to avoid hazards, such as exposure to alcohol and controlled substances in work situations. (Tr. 17) The ALJ found Filbert unable to perform any

past relevant work, but that there are jobs that exist in significant numbers in the national economy that he can perform, including a mail sorter and a surveillance system monitor. (Tr. 22-23) Thus, the ALJ concluded that a finding of "not disabled" was appropriate. (Tr. 24) Filbert appeals, arguing a lack of substantial evidence to support the Commissioner's decision.

### III. Administrative Record

The following is a summary of the relevant evidence before the ALJ.

#### A. Hearing Testimony

The ALJ held a hearing in this matter on October 17, 2012. The ALJ heard testimony from Ryan W. Filbert and D. Gonzales, a vocational expert. (Tr. 29)

#### 1. Filbert's testimony

Filbert was 34 years old at the time of the hearing and lives in Hazelwood, Missouri. (Tr. 31, 43) He has five years of trade school education and two years of traditional college. (Tr. 31) In 2000 and 2001, Filbert was employed by Outback as a waiter and a server. (Tr. 31-32) He was an Outback employee "on and off" until approximately 2004. (Tr. 32) Before 2000, Filbert worked at a landscaping company as a laborer. (Id.) When the ALJ asked specifically about the years between 1995 and 2000, Filbert indicated he would have been doing "some landscaping and Outback." (Id.) However, from 2001 to 2004, Filbert worked as a skilled laborer at Caldwell Mechanical where he worked with sheetmetal and HVC fabrication. (Tr. 32-33) In 2005, Filbert did the same type of work at Coleman Heating and Sheetmetal. Subsequently, from 2005 to 2007, he worked for Service First and in 2008, Lewis Mechanical Services. (Tr. 33) Finally, Filbert was employed with Corrigan Brothers where he injured his left hand on August 23, 2008. (Id.) Filbert's right hand is his dominant hand. (Tr. 44)

3

Subsequent to his injury, Filbert worked at Corrigan doing "auto CAD work." (Tr. 38) In this capacity, Filbert read and reviewed blueprints while making change orders when necessary. (Id.) Initially, he struggled with the "learning curve" involved in auto CAD and had problems with other employees in the specialized field. (Id.) At times, Filbert would get angry with his co-workers. (Tr. 39) Filbert recalled hearing a lot of name calling and accusations that he received his job due to the injury he sustained to his left hand. (Id.) Not long after that, Filbert was terminated from Corrigan Brothers. (Id.)

Filbert filed a workers' compensation claim, which has since been settled for 70 or 80 thousand dollars. (Tr. 33-34, 40) To the best of his knowledge, the claim is completely settled and he has not collected unemployment benefits since his termination from Corrigan Brothers. (Tr. 34) His application for Medicaid was rejected and appealed, but Filbert does not recall if he ever heard anything else regarding his appeal. (Tr. 39) Additionally, Filbert made attempts to find alternate work since 2009, but was unable to locate employment that "[he] thought would suit [him] very well." (Tr. 34) Additionally, Filbert receives roughly $400 a month from a union pension. (Tr. 42)

Although Filbert was not attending any school at the time of the hearing, he had attended St. Louis Community College in the Fall of 2011 for studies in civil engineering. (Tr. 34-35) Filbert has completed three classes and had enrolled in a number of courses that he was unable to finish. (Tr. 38) During his second semester, Filbert explained that he experienced difficulty leaving his home and motivating himself to go to school. (Id.)

Since his injury, Filbert has had approximately 10 surgeries on his left hand – the most recent was on May 27, 2010. (Tr. 35) Presently, Filbert has only his thumb and baby finger on his left hand. (Id.) Similarly, he has received psychological care as of February 2010, but was not

4

undergoing such care at the time of his testimony. (Id.) Filbert received psychological care for approximately six to eight months. (Tr. 36) During that time he was experiencing "[n]ightmares, not being able to sleep, deep depression, thoughts of suicide, [and] anxiety." (Id.) Filbert's nightmares occur at least five times a month. (Tr. 37) When the nightmares occur, Filbert usually wakes up in a cold sweat and remains awake for the remainder of the night. (Id.) Subsequent to his nightmares, Filbert experiences fatigue during his waking hours. (Tr. 36) Additionally, Filbert experiences nearly daily insomnia. (Tr. 40) On average, he gets about four to five hours of sleep a night. (Id.) As a result of his insomnia, Filbert frequently feels tired and stressed. (Tr. 40-41)

As a result, Filbert received treatment through BJC, but quit attending treatments after missing an appointment and "just never rescheduling." (Tr. 36) Filbert acknowledges that the treatment was beneficial and "could have been more beneficial." (Id.) Similarly, he intends to get back into receiving psychiatric care when he finds a way. (Tr. 42) Additionally, BJC had prescribed medications to Filbert when he was receiving treatment. (Tr. 36) Among those medications was "Remeron." (Tr. 40) Filbert testified that Remeron caused him to be "extremely groggy in the mornings and slow and just tired and [he] felt like [he] could never wake up." (Id.) Since quitting his treatment, Filbert self-medicates using ibuprofen. (Tr. 42) Further, he still smokes marijuana from time to time and averages four or five drinks, three to four times per week. (Id.) Although he had a problem with heavy drinking in the past, Filbert believes he no longer has an issue. (Id.)

Moreover, Filbert will isolate himself inside his home three to four days a week. (Tr. 37) He testifies that he has a difficult time "getting out and trusting people." (Id.) Filbert anticipates that something bad may happen to him if he goes out in public. (Id.) He fears many things,

5

including re-injury to his left hand. (Id.) When asked whether he would have a problem with a full time job accepting payment in a parking lot, Filbert testified that it would be difficult for him to be outside of his house that much. (Tr. 41) However, Filbert traveled alone to Columbia, Missouri in order to see Doctor Daniel on two separate occasions. (Tr. 43) Finally, Filbert enjoys trout fishing and recently took a fishing trip with his father. (Tr. 43-44)

### 2.     Testimony of Vocational Expert

Before asking the vocational expert Mr. Gonzales the first hypothetical, the ALJ stated that Filbert's previous work was as a sheetmetal worker, as a server, and as a landscaper. For hypothetical one, the ALJ asked Mr. Gonzales to assume a person with the vocational factors identified (aged 31, approximately 15 years of education, and claimant's past work experience) is capable of lifting twenty pounds occasionally and ten pounds frequently. (Tr. 44) The hypothetical claimant would only be using his left hand as a helper; the hypothetical claimant should never climb ropes, ladders, scaffolds, and can only occasionally crawl, handle, and perform gross or fine manipulate with his fingers. (Id.) The hypothetical claimant's feeling and skin receptors are all limited on the left hand due to the loss of three fingers. (Tr. 44-45) Additionally, the hypothetical claimant is able to understand, remember, and carry out simple or non-detailed tasks while demonstrating adequate judgment concerning simple, work-related decisions. (Tr. 45) Finally, the hypothetical claimant can respond appropriately to supervisors and co-workers, adapt to routine work changes, and take appropriate measures to avoid hazards or exposure to alcohol and controlled substances in work situations. (Id.)

Mr. Gonzales determined that such a person would not be able to perform any of Filbert's past work. (Id.) However, such a person would be able to perform a job such as a mail sorter, 209.687-026, light work, unskilled; SVP of 2. (Id.) There are 25,532 jobs nationally available

6

and 607 such jobs available in Missouri. (Id.) In addition, such a person could perform the job of a surveillance system monitor, 379.367-010, sedentary work, unskilled; SVP of 2. (Id.) There are 32,893 jobs nationally available and 423 such jobs available in Missouri. (Id.) Mr. Gonzales further testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations. (Id.)

Claimant's attorney then asked Mr. Gonzales whether the hypothetical claimant would be able to perform the jobs of mail sorter or surveillance monitor if that claimant missed work four times a month due to insomnia. (Tr. 46) Mr. Gonzales opined the hypothetical claimant would not be able to perform such work due to the rate of absenteeism. (Id.) Similarly, the claimant's attorney asked whether the DOT discussed workers using only one hand on the job. (Id.) Mr. Gonzales indicated the DOT does not discuss work with one hand, but that he has seen workers accomplish it (Id.)

### B. Medical Records

The ALJ summarized Austin's medical records at Tr. 17-19. Relevant medical records are discussed as part of the analysis.

### IV. Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

7

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20

8

C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. The Commissioner may refer to the Medical-Vocational Guidelines or "Grids," 20 CFR Part 404, Subpart P, Appendix 2,[1] to meet this burden. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F.Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir.2009). In determining whether the evidence is substantial, the court considers

---

[1] The Grids "are a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability." Phillips v. Astrue, 671 F.3d 699, 702 (8th Cir. 2012). "If the ALJ's findings as to RFC, age, education, and work experience fit any of the combinations of those criteria contained in the Tables in Appendix 2 to Part 404, then the ALJ must reach the conclusion (either 'disabled' or 'not disabled') directed by the relevant Rule or line of the applicable Table." Id. (quoting Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993)).

9

evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

 (1) The findings of credibility made by the ALJ;
 (2) The education, background, work history, and age of the claimant;
 (3) The medical evidence given by the claimant's treating physicians;
 (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
 (5) The corroboration by third parties of the claimant's physical impairment;
 (6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
 (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

## V. Discussion

In his appeal of the Commissioner's decision, Filbert raises several issues. First, he alleges the ALJ erred in finding that the claimant could perform light work with a limitation requiring simple instructions, non-detailed tasks, and simple work-related decisions. (Doc. No. 15 at 15) Second, Filbert argues the ALJ inappropriately analyzed the claimant's GAF scores in concluding the scores were inconsistent with his high cognitive function. (Id. at 22) Finally, Filbert contends the ALJ erred in determining the claimant could be employed as a mail sorter or surveillance monitor due to those jobs requiring "reasoning at level 3". (Id. at 24). According to

Filbert, the level three requirement is inconsistent with the ALJ's RFC finding. (Id.) Upon review, the Court finds substantial evidence in the record to support the ALJ's decision.

## A. RFC Assessment

Filbert first asserts that the ALJ erred in finding that he could perform work at the light level with the only mental limitation being that Filbert would be limited to work requiring only simple instructions and non-detailed task and requiring only simple work-related decisions. (Doc. 15 at 15) Specifically, Filbert contends that the ALJ did not properly consider his noncompliance with medical treatment and that the RFC was not supported by substantial medical evidence because it was contradicted by the findings of E. Daniels, M.D., Laura Tishey, Psy. D. and Asif Qaisrani, M.D.

RFC is defined as "the most a claimant can do despite [his] limitations." Moore at 523. The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis. SSR 96–8p, 1996 WL 374184, at *1. It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations. Pearsall, 274 F.3d at 1217. RFC is a medical question. Eichelberger, 390 F.3d at 591. An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox, 471 F.3d at 907. In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record." 20 C.F.R. § 404.1527(b); see also Heino, 578 F.3d at 879. "A disability claimant has the burden to establish her RFC." Eichelberger, 390 F.3d at 591.

The Court will address Plaintiff's concerns regarding the RFC determination, noncompliance, the GAF scores, and substantial evidence, together in this section.

11

**1. Compliance**

Filbert asserts that the ALJ did not properly consider his noncompliance with medical treatment. (Doc. 15 at 15) Specifically, Filbert argues that the ALJ "seems to be straddling the fence as to whether or not he is ruling the case against Plaintiff because of Plaintiff's lack of disabling conditions or Plaintiff's alleged noncompliance with medical directives." (Id. at 16). Further, he asserts, if the ALJ declines to award benefits because of noncompliance, it is the ALJ's responsibility to first enter a finding that the claimant is disabled. (Id.) Filbert additionally argues that pursuant to Social Security Ruling 82-59, the ALJ is also required to determine whether the claimant had a justifiable reason for failing to follow treatment. (Doc. 21 at 1) The Commissioner asserts that the ALJ solely considered Filbert's noncompliance in evaluating his credibility. (Doc. 20 at 7)

Social Security Ruling 82-59 does not apply to this case. Social Security Ruling 82-59 only applies to claimants who would otherwise be disabled. "Social Security Ruling 82–59 does not restrict the use of evidence of noncompliance, it merely delineates the reasons that the Social Security Administration may deny benefits to an otherwise disabled person because they fail to comply with their doctor's prescribed treatment." Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (citing Social Security Rule 82-59, 1982 WL 31384). Here, the ALJ determined:

> All the mental health treatment records show the claimant had significant improvement with medication, compliance, and counseling. The claimant's failure to take psychiatric medication further discredits his complaints about his psychiatric difficulties. Even without those medications the record supports a finding the claimant can perform the requirements of unskilled work. . . .

(Tr. 22) The ALJ specifically found that even without his medication, the record supported a finding that that Filbert could perform the requirements of unskilled work. (Id.) He never concluded that, but for the noncompliance, Filbert would be able to return to work. While not

12

always clear, the ALJ appears to use Filbert's noncompliance for the purpose of weighing and determining Filbert's credibility regarding his mental impairments. Because "[a] failure to follow a recommended course of treatment . . . weighs against a claimant's credibility," the ALJ did not err in considering it. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005).

### 2.     GAF Scores

Filbert also argues that the ALJ failed to properly analyze his GAF Scores of 45-50[2] and instead improperly dismissed them as invalid because Filbert's higher cognitive functioning was intact. (Doc. 15 at 22) Further, he argues, the ALJ failed to explain how the low GAF scores would be inconsistent with high intellectual functioning. In support of his assertion, Filbert cites to Pate-Fires, 564 F.3d at 944 for the proposition that "An ALJ must consider a claimant's total GAF score history." (Id.)

The Court finds this case is distinguishable from Pate-Fires. In that case, the Eighth Circuit concluded:

> The total GAF score history indicates the claimant was above 50 only four out of twenty-one times in a six-year period. The ALJ failed to discuss or consider the many GAF scores below 50, including scores as low as 10 and 20. The history of GAF scores at 50 or below, taken as a whole, indicate the claimant has serious symptoms . . . or any serious impairment in social, occupational or school functioning. . . .

Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010) (quoting Pate-Fires, 564 F.3d at 944). In this case, the record does not reflect the same extensive history of GAF scores at or below 50 or the same level of disregard of the GAF scores by the ALJ. The ALJ considered the GAF scores reported by A.E. Daniels, M.D. and Laura Tishey, Psy. D. of 45 and 50 respectively but found

---

[2] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* 32.

13

these scores to be inconsistent with the providers' treatment notes indicating that Filbert was functioning at a high level intellectually. (Tr. 19-20, 423, 447) The ALJ also considered the GAF scores of 50, 55, and 55[3] reported by Asif Qaisrani, M.D. (Tr. 20-21) Although Filbert takes issue with the amount of weight the ALJ afforded certain GAF scores, a "GAF score standing alone, does not establish an impairment seriously interfering with plaintiff's ability to perform basic work activities." Quaite v. Barnhart, 312 F.Supp.2d 1195, 1200 (E.D. Mo. 2004) The GAF scale is used by clinicians to report an individual's overall level of functioning. See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000). "[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." Jones, 619 F.3d at 974. Therefore, the Court concludes that the ALJ properly considered Filbert's GAF scores when determining his mental RFC.

### 3. Substantial Evidence

Filbert next asserts that the RFC's mental limitation was not supported by substantial medical evidence because it was contradicted by the findings of Drs. Daniels, Tishey, and Qaisrani. (Doc. 15 at 15) In response, the Commissioner asserts that the ALJ's opinion should be affirmed because he properly considered all of the evidence in the record as a whole, including Filbert's credibility, Filbert's medical treatment, and Filbert's daily activities. (Doc. 20 at 5)

The Court finds that the ALJ's findings were sufficiently supported in the record and by competent medical evidence. First, the ALJ properly addressed Filbert's credibility. See Pearsall, 274 F.3d at 1218 ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility."); Wildman v. Astrue, 596, 959, 968 (8th Cir.2010)("[W]e will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives

---

[3] A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV 32.

14

a good reason for doing so."). The ALJ discussed a number of inconsistencies in the record. (Tr. 21) For example, although Filbert reported he was treated for AD/HD in high school to Dr. Daniel, he said he was not treated when he spoke with Dr. Qaisrani. (Tr. 21, 445, 491) Further, the ALJ noted, Filbert's reports about his grades, school stress, and keeping appointments were different in the BJC records than when he met with the consultative examiners. (Tr. 21, 471, 480, 491) The ALJ found, "The fact the claimant's validity indicators indicated exaggeration on the Minnesota Multiphasic Personality Inventory–2 also suggests the claimant overstates his emotional problems during the times he is being evaluated for disability." (Tr. 21) Finally, as previously discussed, the ALJ also considered Filbert's lack of compliance in evaluating Filbert's credibility. (Id.)

The ALJ also considered Filbert's mental health treatment. The ALJ determined that Filbert "is [currently] receiving no mental health treatment." (Tr. 20) Filbert's discontinuation of treatment further undermines his credibility that he suffers from a severe mental impairment. See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem.") The ALJ next reviewed Filbert's prior mental health treatment, specifically the medical opinion evidence of Drs. Daniels, Tishey and Qaisrani. The ALJ gave the opinions of Drs. Daniels and Tishey "some weight" but not "great weight" because although they provided comprehensive reports, they only examined Filbert one time and relied largely on the claimant's subjective complaints. (Tr. 22) He gave the opinions of Dr. Qaisrani and Filbert's case workers and counselors at BJC "great weight" citing to Social Security Rule 06-03p. (Id.) The Court finds that the ALJ gave good reasons to explain the weight given these opinions.

Drs. Daniels and Tishey found Filbert had significant mental health limitations and GAF scores of 45 and 50 respectively. The ALJ discredited these GAF scores, as indicated in more detail above, because the ALJ found that these doctors' reports show that Filbert is functioning at a high level. (Tr. 20) The ALJ noted, for example, that Dr. Tishey reported the claimant remembered three of three words after a three and five minute delay. (Tr. 20, 422) The ALJ found that the BJC records were "noteworthy" because Filbert self-reported his strengths as intelligence, clear thinking, and logic. (Tr. 20, 452) The ALJ also reviewed Dr. Qaisrani's diagnosis of posttraumatic stress disorder, major depression, alcohol abuse, moderate to severe psychosocial stressors, and a GAF of 50. (Tr. 20) Further, the ALJ also considered Filbert's Activities of Daily Living, making specific note of Filbert's ability to drive 100 miles, twice, for a consultative examination. (Tr. 21)

The Court finds that the ALJ properly accounted for Filbert's mental deficiencies with the finding that Filbert could "understand, remember, and carry out at least simple instructions and non-detailed tasks." (Tr. 17) The Court, therefore, finds that the ALJ's decision as it relates to Filbert's RFC is supported by substantial medical evidence in the record as a whole. See Bryant v. Colvin, No. 13–2351 (8th Cir. Sept. 25, 2014) (affirming the district court's decision that, despite claimant's subjective complaints of pain and other limitations, the "substantial evidence in the record as a whole supports the ALJ's credibility assessment, his hypothetical to the VE, and his ultimate finding that [claimant] was not disabled during the period in question.").

## B. VE's Response to the Hypothetical

Lastly, Filbert asserts that the ALJ erred in finding that he could be employed as a mail sorter or surveillance system monitor because, according to the DOT, these occupations require reasoning at a level three which he argues is inconsistent with the ALJ's RFC determination that

Filbert is limited to work that requires only simple instructions on non-detailed tasks. (Doc. 15 at 24) In response, the Commissioner asserts that the potential inconsistency between the DOT requirement and the ALJ's determination of Filbert's RFC does not warrant remand. (Doc. 20 at 14)

The ALJ limited the hypothetical as follows: "[T]his hypothetical claimant is able to understand, remember, and carry out at least simple instructions, non-detailed tasks . . . ." (Tr. 45) The VE indicated, given this limitation along with several others, that the hypothetical claimant would not be able to return to any of Filbert's past relevant work but would be able to other work as a mail sorter, DOT 209.687-026, or surveillance system monitor, DOT 379.367-010. The ALJ thereafter asked, "Has your testimony today been consistent with the DOT and the Selected Characteristics of Occupations?" to which the VE replied, "Yes, sir." (Id.) The ALJ addressed this exchange in his opinion as follows: "The vocational expert's testimony was consistent with the Dictionary of Occupational Titles and its companion publication the Selected Characteristics of Occupations" and then he cited to SSR 00-4p. (Tr. 24) Filbert asserts that these jobs, requiring level three reasoning, are inconsistent with the RFC as presented in the ALJ's hypothetical because simple work appears in the DOT under reasoning level one. (Doc. 15 at 25)

The Eighth Circuit directs this Court to treat the DOT as "generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." Welsh v. Colvin, 765 F.3d 926, 929 (8th Cir. 2014). "An ALJ cannot rely on expert testimony that conflicts with the job classifications in the Dictionary of Occupational Titles unless there is evidence in the record to rebut those classifications." Hillier, 486 F.3d at 366. Social Security Rule 00–4p, mandates: "When a [vocational expert] or [vocational specialist] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to

ask about any possible conflict between that [vocational expert] or [vocational specialist] evidence and the information provided in the [Dictionary of Occupational Titles ]." Jones, 619 F.3d at 977. The ALJ is therefore required not only to ask the expert whether there was a conflict, but also to obtain an explanation for any such conflict. Id. The Eighth Circuit has explained the reasoning development levels as follows:

> Each occupation in the DOT is coded with a reasoning development level, which corresponds to the ability to follow instructions and solve problems that is required for satisfactory job performance. Only occupations with a reasoning development level of one necessarily involve only simple instructions. At reasoning development level two, occupations might necessitate applying "commonsense understanding to carry out detailed but uninvolved written or oral instructions" and dealing with "problems involving a few concrete variables in or from standardized situations." The occupations at level three, which include the cashier position identified by the vocational expert, might involve applying "commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and dealing with "problems involving several concrete variables in or from standardized situations."

Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010) (citing Dictionary of Occupational Titles app. C (4th ed.1991)).

The question before the Court today is whether there was a conflict between the VE's testimony and the DOT. The law in this Circuit is clear –any potential inconsistency between a reasoning level of three and the ability to follow only simple instructions on non-detailed tasks is not a conflict. Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) (citing Hillier, 486 F.3d at 367) ("expert's opinion that claimant who was limited to following 'simple, concrete instructions' could work as cashier was not inconsistent with *Dictionary of Occupational Titles* description of cashier as requiring level three reasoning.") See also Welsh, 765 F.3d at 930 ("The failure to address any potential inconsistency between the RFC's limitation to simple, routine, repetitive work and the DOT's requirement of level three reasoning does not require a remand.")

Therefore, the ALJ adequately addressed any inconsistency between the VE's testimony and the DOT.

## VI. Conclusion

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

Dated this 31st day of March, 2015.

*John A. Ross*
**JOHN A. ROSS
UNITED STATES DISTRICT JUDGE**